**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARL LASSITER, CHARLES WILSON, DARLENE E. MILEY, and DAWN PATTERSON,<br>      **Plaintiffs,**<br><br>      v.<br><br>CHILDREN'S HOSPITAL OF PHILADELPHIA,<br>      **Defendant.** | ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION**<br>**NO. 05-cv-6834** |

FILED

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

---

## MEMORANDUM OPINION AND ORDER

RUFE, J.

January 31, 2008

      This is an employment-discrimination case in which Plaintiffs, a group of former and current employees of the Children's Hospital of Philadelphia, allege racial discrimination under 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII")[1], and the Pennsylvania Human Relations Act ("PHRA"),[2] as well as a pendent state claim of intentional infliction of emotional distress. Presently before the Court are the Motions for Summary Judgment filed by Defendant Children's Hospital of Philadelphia ("Defendant" or "CHOP"), submitted separately as to each of the four remaining plaintiffs in this matter.[3] For the reasons that follow, the Court grants Defendant's Motions for Summary Judgment in part and denies in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[4]

      These are motions for summary judgment, thus, the Court views the factual Record in

---

[1] 42 U.S.C. § 2000e (2003).

[2] 43 Pa. Stat. Ann. § 954 (1991).

[3] Doc. #s 39-42.

[4] Parties previously dismissed from this litigation have not been named herein as the Court finds their specific names insignificant to the outcome of the issues.

the light most favorable to Plaintiffs as the non-moving party.[5]  Plaintiffs Carl Lassiter, Charles

Wilson, Darlene Miley and Dawn Patterson each assert claims of hostile work environment and failure

to promote under § 1981, a pendent state claim of intentional infliction of emotional distress, and

Plaintiff Lassiter individually asserts additional claims of racial discrimination in violation of Title VII

and the PHRA.  All Plaintiffs are African-American employees of CHOP.[6]  They were employed by

CHOP at all times relevant to this case and remain employed by CHOP to this date, with the exception

of Charles Wilson, whose employment was terminated in December 2004.[7]  Plaintiffs assert that CHOP

has exhibited a pattern and practice of racial discrimination against African-American employees in

violation of the laws of the United States and the Commonwealth of Pennsylvania.[8]  Plaintiffs endeavor

to illustrate what they characterize as a "mosaic" of the alleged pattern of institutional racism at CHOP

by pointing out some of the instances of alleged racism they have experienced as employees.[9]

More particularly, Plaintiffs allege that there is a condescending attitude toward

African-Americans at CHOP that is exhibited by the demeanor, deliberate body language, facial

expressions, and substantive communication used in addressing them that is noticeably different than

the attitude used in addressing employees of other races, especially those of Asian, particularly Indian,

descent;[10] that from 2002 through the date of filing this suit, there was a dramatic difference in how

African-American employees and Caucasian employees were treated in the context of hiring,

---

[5] See Elliot & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318 (3d Cir. 2006).

[6] Amen. Compl. at 3, ¶¶ 1-2.

[7] Pl. Wilson's Resp. to Def.'s Mot. for Summ. J. at 1.

[8] Amen. Compl. at 16, ¶¶ 72-73.

[9] Pl. Wilson's Resp. to Def.'s Mot. for Summ. J. at 2.

[10] Amen. Compl. at 11, ¶¶ 44.

promotions, and overall treatment; and that there were numerous incidents where Caucasian employees were assigned a job, "hand-held" by their superiors, and given much leeway until they received the necessary training to fulfill the requirements of their position, whereas African-Americans were denied the same job if they did not first obtain the necessary training.[11]  In addition, Plaintiffs assert that from 2002 to the filing of this lawsuit in 2005, a CHOP supervisor allegedly advised Plaintiff Carl Lassiter and other African-American employees that they were playing music and laughing too loudly, while other non-African-American employees were not criticized for the same activities.[12]  Plaintiffs further allege that from 2002 through 2004, CHOP initiated an entirely different, more restrictive, standard for employees to obtain approval for displays as well as other commemorative and celebratory items and events related to Black History Month, as opposed to the standard required for non-African-American oriented events.[13]

It is uncontested that the Administrative Director of Pathology and Clinical Laboratories at CHOP, who supervised Plaintiffs Wilson and Lassiter among others, had an autocratic work and leadership style.[14]  CHOP employees of different races complained about unfair treatment from this supervisor and others at CHOP.[15]  This same supervisor ordered the removal of radios from central lab areas and the phlebotomy department, then eventually all lab areas, shortly after being

---

[11] Amen. Compl. at 12-13, ¶¶ 52-53.

[12] Amen. Compl. at 10, ¶ 43.

[13] Amen. Compl. at 11, ¶¶ 45-46.

[14] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 4 (citing Wilson and Hankinson's Dep.).

[15] See Pl. Wilson's Resp. to Def.'s Mot. for Summ. J., Exh. B.

contacted by the President of CHOP about a complaint made by a parent of a patient.[16]  The patient's

parent had asked a Caucasian employee in the phlebotomy department a question, and the employee

told her to wait until she finished listening to a song.[17]  It is also uncontested that none of the Plaintiffs

told anybody at CHOP that they believed this supervisor's request to lower their voices to be racially

motivated.[18]

Plaintiffs further allege that CHOP organized its departments so that employees are

hired, assigned, promoted, or demoted, based, in part, upon their race, and that African-Americans,

including the named Plaintiffs here, have been systematically excluded from advancing to supervisory

positions.[19]  Plaintiffs claim that their work records confirm their qualifications to serve in advanced

supervisory positions, or to at least become eligible for consideration for advanced positions, but that

they were denied these positions in favor of less qualified non-African-American employees,[20]

resulting in a disproportionately low number of African-American directors and supervisors at

CHOP.[21]

Plaintiffs allege CHOP had knowledge of, or with reasonable diligence should have had

knowledge of, the alleged pattern of racism, and that CHOP had the power to prevent or aid in the

---

[16] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 5 (citing Lassiter and Hankinson's Deps.).

[17] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 4-5 (citing Lassiter and Hankinson Deps.).

[18] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 5 (citing Lassiter Dep. at 36-37, 54-56).

[19] Amen. Compl. at 14, ¶¶ 60-63.

[20] Amen. Compl. at 14, ¶ 64.

[21] Amen. Compl. at 13, ¶¶ 54-55.

prevention of such wrongs, but neglected or refused to do so.[22]   Plaintiffs allege that the CHOP supervisors complained of were, at all times material hereto, acting both as individuals and as duly-authorized agents of CHOP, in furtherance of the business of CHOP, and within the scope of their employment and the goals of CHOP.[23]   Plaintiffs claim they made numerous complaints to CHOP supervisors about the unfair treatment of African-Americans, and they allege that CHOP refused to consider Plaintiffs' grievances.[24]   Plaintiffs claim they attempted to improve on or eliminate the alleged racist pattern by informal methods including conference, conciliation and persuasion, but their efforts all failed.[25]

In addition to the generalized complaints, certain plaintiffs assert more specific allegations, as follows:

### A.    Carl Lassiter

Plaintiff Carl Lassiter is the sole plaintiff with surviving claims of racial discrimination in violation of Title VII and the PHRA.[26]

Plaintiff Lassiter claims he was denied a promotion in 2005, in favor of a less-qualified Caucasian employee.[27]   At the time of the promotion at issue, Lassiter was allegedly told by his

---

[22] Amen. Compl. at 15, ¶ 69.

[23] Amen. Compl. at 16, ¶¶ 69-70.

[24] Amen. Compl. at 15, ¶ 67.

[25] Amen. Compl. at 15, ¶ 68.

[26] Initial claims of conspiracy, implied covenant of good faith and fair dealing, and fraud, were dismissed by Order of this Court on October 13, 2006 [Doc. #21].

[27] Amen. Compl. at 8-9, ¶¶32-33.

superior at CHOP that he did not have supervisory experience.[28]  Lassiter claims that the individual

promoted was not only younger than Lassiter but also had never worked in the department to which he

was promoted.  In contrast, Lassiter had seven years of experience at CHOP at the time of the incident

at issue, and as the senior medical technologist, he had been supervising employees for years.[29]

Lassiter was a Senior Medical Technologist in the clinical laboratory area for the

majority of the time period relevant to this case.[30]  Lassiter applied for the position of Supervisor of

Central Laboratory Services, the position previously held by Plaintiff Wilson.[31]  After a series of

uniform questions were posed to the candidates, each candidate also being subjected interviews and

meetings, a panel of CHOP employees selected a Caucasian employee whose prior position was

Assistant Supervisor in the Phlebotomy Department.[32]  Lassiter received negative performance reviews

from some supervisors, including Plaintiff Charles Wilson, which were critical of his workplace

conduct, attitude, attendance, and professionalism.[33]  Lassiter was later given a pay raise and promoted

to Assistant Supervisor of Central Laboratory Services, a newly created position.[34]

**B.    Charles Wilson**

Plaintiff Charles Wilson claims to have been "hounded out" of his position as a

Supervisor of Central Lab Services by being told that his position was to be eliminated.  Wilson's

---

[28] Amen. Compl. at 8-9, ¶¶32-33.

[29] Amen. Compl. at 8-9, ¶¶32-33.

[30] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 3 (citing Lassiter Dep. at 65-66).

[31] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 6 (citing Lassiter Dep. at 57).

[32] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 6.

[33] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 3 (citing Lassiter and Wilson's Deps.).

[34] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 7 (citing Lassiter Dep. at 15, 171-72).

position, however, was never eliminated, and weeks after his termination, his position was filled by a Caucasian employee. Two Caucasian supervisors retained their positions in the same department of CHOP that Wilson worked in at the time of his termination, and he claims that he was more qualified than both of these employees. Wilson further alleges he was denied a promotion that would have allowed him to remain an employee of CHOP, but he was told this position was also to be eliminated. Wilson alleges that he experienced multiple inequities in job application and advancement during his twenty-two-year tenure at CHOP. As an example of this alleged pattern, in connection with a promotion he did not receive, which he and other CHOP employees felt he deserved, Wilson claims that he was told by another CHOP employee, "You know you were the most qualified person for the job, but you didn't get it because, you know why."[35] It is uncontested that the employee appointed as Core Lab Manager scored higher than Wilson on the candidate skills test, which was used to evaluate candidates for that position, and that Wilson scored second highest out of the candidates considered.[36] The candidate promoted ahead of Wilson previously ran a Core Lab for the University of Pennsylvania Hospital.[37]

Plaintiff Wilson also alleges that during a conversation with a director of a department at CHOP, the director stared out of a window and kept his back turned to Wilson during the entire conversation.[38] Lastly, Plaintiff Wilson alleges that a CHOP supervisor referred to "those people" in a

---

[35] Amen. Compl. at 10, ¶41.

[36] Def.'s Reply to Pl. Wilson's Resp. to Def.'s Mot. for Summ. J. at 16-17.

[37] Def.'s Reply to Pl. Wilson's Resp. to Def.'s Mot. for Summ. J. at 17.

[38] Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 9.

conversation, and Wilson took that to refer to African-Americans.[39]

### C.    Darlene Miley

Plaintiff Darlene Miley claims she has trained seventeen employees in the Virology Department of CHOP to do various jobs, but in five years has not been trained to procure any higher-skilled positions herself.[40]  Most of the employees Miley trained were Caucasian.[41]  Miley claims that several people with less experience have passed through the Virology Department and attained higher positions than she currently holds.[42]  Miley claims she was told by CHOP that she would also receive training in new techniques, but has neither received such training nor been promoted.[43]  Miley also claims to have been subject to, and sometimes the subject of, numerous racial remarks at CHOP.  The only remark she specifies is, "Virology doesn't keep Blacks in this department, I give you six months," which she was allegedly told by a co-worker.[44]

It is undisputed that during the time relevant to this lawsuit, Miley applied for the positions of Blood Bank Technologist and Assistant Supervisor of Phlebotomy.[45]  Miley was offered the Blood Bank Technologist position, but declined to accept it because her then supervisor in the Virology Department did not want to lose her.[46]  Plaintiff accepted a promotion to the position of

---

[39] Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 9.

[40] Amen. Compl. at 8, ¶30.

[41] Amen. Compl. at 8, ¶30.

[42] Amen. Compl. at 8, ¶30.

[43] Amen. Comp. at 8, ¶31.

[44] Amen. Compl. at 8, ¶29.

[45] Def.'s Reply to Pl. Miley's Resp. to Def.'s Mot. for Summ. J. at 5 (citing Miley Dep. at 84-85).

[46] Def.'s Reply to Pl. Miley's Resp. to Def.'s Mot. for Summ. J. at 5 (citing Miley Dep. at 84-86).

Assistant Supervisor of Phlebotomy, and that is where she is employed currently.[47]

As a result of the allegedly willful and unlawful actions of Defendants, Plaintiffs claim to have suffered severe loss of professional status and reputation in the community of their peers, severe losses in pay, benefits and other employee remunerations, as well as severe mental anguish, embarrassment, physical discomfort, the inability to effectively carry out their duties, and other mental, physical and emotional damages.

A stipulation and order dismissing all claims against seven individual defendants was entered on June 9, 2006, leaving  CHOP as the sole defendant in this case.[48]  By Order of this Court on October 13, 2006, Counts III (conspiracy) and VI (implied covenant of good faith and fair dealing) of Plaintiffs' Complaint were dismissed with prejudice, Count VIII (fraud, deceit and misrepresentation) was dismissed without prejudice and Plaintiffs were granted leave to amend their complaint with the requisite particularity, which they failed to do.  Counts IV (hostile work environment pursuant to § 1981) and V (failure to promote/breach of contract under § 1981) were limited to a four-year statute of limitations, and Counts I (violation of Title VII) and II (violation of the PHRA) were dismissed as they relate to all Plaintiffs except Carl Lassiter.[49]  Lastly, a Stipulation of Dismissal With Prejudice of All Claims Brought By Durwood Hankinson, Dionne Wilson, and Helena Whitest was entered on April 27, 2007.[50]

---

[47] Def.'s Reply to Pl. Miley's Resp. to Def.'s Mot. for Summ. J. at 5 (citing Miley Dep. at 84-86).

[48] Doc. # 15.

[49] Doc. # 21.

[50] Doc. # 37.

## II.     STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[51]   A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."[52]   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[53] All inferences must be drawn, and all doubts resolved, in favor of the nonmoving party.[54]

If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to do more than simply show that there is some metaphysical doubt as to the material facts.[55]   The nonmoving party cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.[56]   A mere scintilla of evidence in support of the nonmoving party's position will not suffice; rather, the non-moving party must present evidence on which a jury could reasonably find for the nonmovant in order to survive summary judgment.[57] Accordingly, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

---

[51] Fed. R. Civ. P. 56(c).

[52] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[53] Id.

[54] Id. at 255.

[55] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[56] Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

[57] Liberty Lobby, 477 U.S. at 252.

element essential to that party's case, and on which that party will bear the burden of proof at trial."[58]

## III.   DISCUSSION

Plaintiffs' remaining claims in this action are: 1) racial discrimination in violation of Title VII[59]; 2) racial discrimination in violation of the PHRA[60]; 3) hostile work environment under § 1981 due to racial discrimination; 4) failure to promote under § 1981 due to racial discrimination; and 5) intentional infliction of emotional distress ("IIED").  Claims of indirect discrimination, including failure to promote, hostile work environment, and disparate treatment, are analyzed under the same McDonnell Douglas burden shifting analysis described below, whether they are predicated on Title VII, § 1981, or the PHRA.[61]  Therefore, the Court will apply the same burden shifting analysis to Plaintiffs' employment discrimination claims under Title VII, the PHRA, and § 1981.  The Court will address Plaintiffs' failure to promote and IIED claims separately because they are based on facts specific to each complainant.

### A.   Racial Discrimination Pursuant To Title VII, The PHRA and § 1981

In an employment discrimination case where no direct evidence of intentional discrimination is present, as is the case here, the Court must apply the burden shifting test established by the Supreme Court in McDonnell Douglas Corp. v. Green.[62]  Under this test, the plaintiff carries the initial burden of establishing a *prima facie* case of racial discrimination, under the asserted cause of

---

[58] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[59] Only as to Plaintiff Carl Lassiter.

[60] Only as to Plaintiff Carl Lassiter.

[61] Boyer v. Johnson Matthey, Inc., No. 02-8382, 2005 WL 35893, at *12 n.17 (E.D. Pa. Jan. 6, 2005) (citing Weston v. Pa. Dep't of Corr., 251 F.3d 420, 426 n.3 (3d Cir. 2001)).

[62] 411 U.S. 792 (1973).

action, by a preponderance of the evidence.[63]  The burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection.[64]  Once the employer articulates a non-discriminatory reason, the complainant must respond by citing evidence that the employer's rationale is not true, but it is actually a pretext for discrimination.[65]  In order to create a genuine issue of material fact as to whether the proffered reasons are pretextual, the plaintiff must "'point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"[66]

## 1.   Hostile Work Environment Under § 1981[67]

Defendant seeks summary judgment on Plaintiffs' claims for violation of Title VII, violation of the PHRA, and hostile work environment under § 1981, arguing that Plaintiffs have no evidence to establish a *prima facie* case of hostile work environment, and even if they did, Plaintiffs cannot prove respondeat superior liability against CHOP.  In order to establish a *prima facie* case of hostile work environment due to discrimination, a plaintiff must show that: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive

---

[63] Id. at 802.

[64] Id.

[65] Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action.")

[66] Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quoting Fuentes, 32 F.3d at 764).

[67] Plaintiff Lassiter claims racial discrimination in violation of Title VII and the PHRA.  Although he alleges facts that are more closely related to a claim for disparate treatment on account of race, he did not expressly plead that cause of action, so the Court interprets the Title VII and PHRA claims together with the hostile work environment claims asserted by Lassiter and all Plaintiffs.

and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) respondeat superior liability exists.[68]

Plaintiffs point to several incidents to attempt to illustrate a racially discriminatory work environment. First, Plaintiff Lassiter was turned down for a promotion in 2005 in favor of a Caucasian employee he alleges was less qualified than him.[69] Second, a certain CHOP supervisor told African-American employees, including Plaintiffs Lassiter and Wilson, that they were playing their music and laughing too loudly, whereas non-African-American employees were not told the same. Third, Plaintiff Miley was subject to racial remarks such as "Virology doesn't keep Blacks in the Department, I give you 6 months."[70] Fourth, Plaintiff Miley trained seventeen other employees, most of them Caucasian, but was never trained to fill any higher-skilled positions as CHOP promised her. Miley claims to have seen numerous less experienced employees pass through her department and go on to seek higher positions, but claims she was never promoted because of her race.[71] Fifth, Plaintiff Wilson alleges he was forced out of his position as Supervisor of Central Lab Services, being told his position would be eliminated, then after he left CHOP, the position was filled by a Caucasian person. Additionally, Wilson was denied a promotion when he was told his position would be eliminated, and he claims two Caucasian supervisors were allowed to keep their jobs in the same department. Another CHOP employee allegedly told Wilson, "You know you were the most qualified person for the job, but

---

[68] Sherrod v. Philadelphia Gas Works, 57 Fed. App'x 68, 75 (3d Cir. 2003) (citing West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995)).

[69] Discussed in greater detail at Part IV.C. infra, discussing the failure to promote claims.

[70] Amen. Compl. at 8.

[71] Id.

you didn't get it because, you know why."[72]  Sixth, Plaintiff Wilson alleges that during a conversation with a director of a department at CHOP, the director stared out of a window and kept his back turned to Wilson during the entire conversation.  Seventh, Plaintiff Wilson alleges that a CHOP supervisor referred to "those people" in a conversation, and Wilson took that to refer to African-Americans.[73] Lastly, Plaintiffs allege they all experienced a condescending attitude from non-African-American supervisors, and they were treated worse than their counterparts of other ethnicities, especially employees of Asian descent, and more particularly, Indian employees.

The Third Circuit has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."[74]  Therefore, we must determine whether all of the alleged conduct was collectively severe and pervasive enough to create a hostile work environment.

Cardenas v. Massey[75] exemplifies a case where the Third Circuit found an employer's conduct sufficiently severe and pervasive to constitute a hostile work environment.  In Cardenas, the defendant employer subjected a Mexican-American plaintiff to ethnic slurs referring to him as "the boy from the barrio" and "mojado" (the Spanish translation of "wetback"), asked the plaintiff during disagreements if he would pull a switchblade to resolve them, posted derogatory messages on the marker board in the plaintiff's cubicle, rounded the evaluation scores of all other employees up while

---

[72] Amen. Compl. at 10.

[73] Def.'s Mot. for Summ. J. as to Pl. Wilson at 10; Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 9.

[74] Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001).

[75] 269 F.3d 251.

rounding the plaintiff's down, intentionally gave the plaintiff contradictory instructions and tasks that were impossible to perform, and referred to him as an "affirmative-action hire."[76]  Likewise, in <u>Aman v. Cort Furniture Rental Corp.</u>,[77] the Third Circuit found a hostile work environment where African-American employees were referred to as "one of them" or "another one," told not to touch anything or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, were given conflicting orders, and a general manager stated at a district meeting that "the blacks were against the whites" and if anybody didn't like it at Cort Furniture, they could leave.[78]

Even assuming the incidents Plaintiffs allege were all racially motivated, the Court finds that they were not sufficiently severe and pervasive to establish a *prima facie* hostile work environment.  Instead, Plaintiffs' claims are more similar to <u>Sherrod v. Philadelphia Gas Works</u>,[79] in which the plaintiffs fell short of the severity and pervasiveness requirement of a hostile work environment claim where a manager said "he didn't like the way they [two African-American employees] were eating at their desks, it must be their culture," and another manager said "if they [two African-American employees] don't do their work, I'm going to sit at their desks with a whip."[80]  In <u>Sherrod</u>, the Third Circuit held that unlike <u>Cardenas</u>, there was no evidence that anyone ever referred to the plaintiffs using racial slurs, and that the statements the plaintiffs considered offensive were subject

---

[76] <u>Id.</u> at 263.

[77] 85 F.3d 1074 (3d Cir. 1996).

[78] <u>Id.</u> at 1082-84.

[79] 57 Fed. App'x 68.

[80] <u>Id.</u> at 76.

to non-racial interpretation and were not physically threatening or humiliating.[81]  In addition, there was no evidence that these incidents unreasonably interfered with the plaintiff's work performance, as was the case in Cardenas and Aman.[82]  Lastly, the court found that even if the conduct described had a detrimental effect on appellant's mental health, these incidents would not have detrimentally affected a reasonable person in appellant's position.[83]

Granting Plaintiffs every benefit of the doubt, it is clear that their allegations against CHOP are analogous to the plaintiff's allegations in Sherrod, and distinguishable from the plaintiffs' claims in Cardenas and Aman.  As in Sherrod, Plaintiffs here do not show any evidence of racial slurs being used at CHOP, the statements Plaintiffs considered offensive, including requests to turn their radios down and speak more quietly, "you didn't get the job because, you know why," and even "Virology doesn't keep blacks in the Department, I give you six months," are subject to non-racial interpretation and they are obviously not physically threatening.  In sum, Plaintiffs' claims have not met the severe and pervasive standard necessary to establish a failure to promote claim.

Additionally, Plaintiffs have not presented any evidence to show that the incidents alleged interfered with their work performance, as was also the case in Sherrod.  Similarly, in Woodward v. DHB Die Casting, the Third Circuit found the African-American plaintiff's evidence insufficient to establish a sufficient showing of change in employment conditions where the phrase "you people" was used to refer to his race, he was asked if he planned to execute a drug deal during a bathroom break, and graffiti depicting a burning cross and a Klu Klux Klan sign on a bathroom wall at

---

[81] Id. at 77.

[82] Id.

[83] Id.

work remained posted for three months after he reported it to his employer.[84]  With respect to the comments alleged, the <u>Woodward</u> Court held that "even assuming these somewhat ambiguous incidents were related to Woodward's race, they are the type of offhand comments that are insufficient to support a hostile work environment claim."[85]  Even in conjunction with the cross-burning and KKK graffiti in the bathroom, the <u>Woodward</u> Court held that even though the graffiti is more serious, it was still not enough for a trier of fact to conclude that discriminatory conduct effected a change in Woodward's employment conditions.[86]

Further, in <u>Rose v. Woolworth Corp.</u>, the Eastern District of Pennsylvania granted summary judgment to the defendant employer on a hostile work environment claim where the plaintiff alleged a supervisor subjected him to constant and unremitting negative comments and evaluations based at least in part on her African-American race, referred to the black community as a baby factory, stated that blacks are incapable of thinking analytically, and warned the plaintiff, an African-American male, not to talk to white women.[87]  In <u>Rose</u>, the Court found that the plaintiff had not satisfied the elements of hostile work environment to establish a *prima facie* case, specifically, that "there is no evidence of the sort of extreme conduct that could reasonably be considered to constitute a 'change in terms and conditions of employment.'"[88]  In light of the weight of Third Circuit case law, even under the most charitable view of the Record before us, it is clear that the evidence offered by Plaintiffs is

---

[84] No. 05-5485, 2007 WL 3257201, at *1-2 (3d Cir. Nov. 6, 2007).

[85] <u>Id.</u> at *2 (citing <u>Caver v. City of Trenton</u>, 420 F.3d 243, 263-64 (3d Cir. 2005)).

[86] <u>Id.</u>

[87] 137 F. Supp. 2d 604, 608, 611 (E.D. Pa. 2001).

[88] <u>Id.</u> at 611.

insufficient to establish a change in the terms and conditions of Plaintiffs' employment necessary to make out a *prima facie* case of hostile work environment.

Moreover, assuming *arguendo* that Plaintiffs have established a *prima facie* case of hostile work environment, their proffered evidence falls far short of the standard required to rebut Defendant's non-discriminatory reasons for its conduct.  Defendant presents evidence, Lassiter's deposition testimony, along with the deposition of a former Plaintiff whose claims were dismissed, to show that another employee received a promotion instead of Lassiter because the favored employee had supervisory experience, where Lassiter did not.  Defendant presents evidence from the report of an internal investigation of CHOP conducted by Pat Pierce ("Pat Pierce Report"), a labor attorney, to show that the person who received a promotion over Wilson was ranked highest in CHOP's evaluation of candidates for the position, not because of his race.[89]  Additionally, Defendant presents excerpts from Lassiter's deposition where he testified that his evaluations showed he had problems working well with others and Defendant also presents evidence from the Pat Pierce Report that confirmed Lassiter's negative reviews from other CHOP employees.  CHOP points to excerpts from the Pat Pierce Report to prove that the radio policy was instituted as to all employees, not just African-American employees.  CHOP offers evidence to show that Plaintiff Miley applied for two promotions simultaneously, and in fact received the higher paying of the two positions she sought.  Lastly, Defendant presents deposition testimony and portions of the Pat Pierce Report to show that employees

---

[89] Defendant CHOP hired Patricia V. Pierce, Esquire, to "undertake and complete an investigation pertaining to claims of racial discrimination concerning certain African-American employees of certain of CHOP's clinical laboratories."  Pl. Wilson's Resp. to Def.'s Mot. for Summ. J., Exh. B at 1.  The Court considers excerpts from the Pat Pierce Report for the purpose of identifying the evidence presented by the parties in support of their respective arguments.  However, the conclusions of an investigative report cannot influence this Court's ultimate determination of whether Plaintiffs have established *prima facie* claims, whether defendant has proffered legitimate non-discriminatory reasons for its actions, or whether Plaintiffs have shown that Defendant's reasons are pretextual.

of all races complained of unfair treatment by certain members of the management at CHOP that were central to Plaintiffs claims, not only African-American employees.

To discredit the employer's legitimate reason(s), "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent" in its employment decisions.[90]  Instead, the non-moving plaintiff must illustrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"[91]  Plaintiffs present no such evidence here, as the vast majority of their argument in these motions is based on assumptions and unsubstantiated allegations made in the Complaint, and simply fail to cite a sufficient body of evidence in the Record to support their arguments opposing Defendant's well supported reasons for its action.  So, even if Plaintiffs could establish a *prima facie* case of hostile work environment, which they have not, the <u>McDonnell Douglas</u> analysis would still compel dismissal of these claims.  Therefore, Defendant is entitled to summary judgment on the hostile work environment claims of all the remaining Plaintiffs.

## 2.    Failure to Promote Under § 1981

Defendant argues that it is entitled to summary judgment on Plaintiffs' claim of failure to promote under § 1981 because Plaintiffs cannot make out a *prima facie* case of discrimination, and

---

[90] <u>See</u> <u>Fuentes</u>, 32 F.3d at 765 (citing <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 531 (3d Cir. 1992)).

[91] <u>Id.</u>

because CHOP had legitimate, non-discriminatory reasons for its hiring and promotion decisions.  In order to establish a *prima facie* claim of failure to promote, a plaintiff must show that: (1) she is a member of a protected class; (2) she applied, and was qualified for, a position the employer was seeking applicants to fill; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons with equal qualifications to the complainant.[92]  Because Plaintiffs assert their failure to promote claims pursuant to § 1981, the Court applies the same <u>McDonnell Douglas</u> analysis we applied to the hostile work environment claim above.

Each Plaintiff's specific allegations regarding their respective failure to promote claims will be addressed individually.

### (a)    Carl Lassiter

Defendant argues that it is entitled to summary judgment on Plaintiff Lassiter's failure to promote claim because Lassiter has not established a *prima facie* case of discrimination, and even assuming he has, CHOP had legitimate, non-discriminatory reasons for its employment decision.  Lassiter argues that he was more qualified for a position he sought than the Caucasian employee who received it, and that Defendant's assertion that Lassiter did not have supervisory experience is merely a pretext to mask the real reason he was not promoted, which is racial bias.  In support of his argument, Lassiter points to his experience in excess of seven years in the department in which he sought a promotion, Defendant's monetary offer to settle his claims, and his promotion to another position

---

[92] <u>Ford v. Skipping Stone, Inc.</u>, No. 02-8906, 2003 WL 1860553, at *2 (E.D. Pa. April 8, 2003) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).

based on merit, months after this lawsuit was initiated.[93]  Lassiter argues that this evidence establishes a *prima facie* case of failure to promote and shows that the real reason for CHOP's initial failure to promote him, and for his subsequent promotion, was because the filing of this lawsuit "shone a light" on the alleged pattern of racial discrimination at CHOP, not for any legitimate, non-discriminatory reason as Defendant asserts.[94]

In support of its argument that CHOP had legitimate reasons for not promoting Lassiter, Defendant points to Lassiter's performance evaluations, some prepared by co-Plaintiff Charles Wilson, to highlight his "problems in working in teams and his abrasive and confrontational style."[95] Additionally, Defendant points to the Pat Pierce Report, which ultimately concluded that Lassiter's record supported the conclusion that he was not the most qualified for the position he sought. Defendant also presents evidence showing that Lassiter reviewed the Pierce Report and responded that it was fair and not influenced by CHOP.[96]  Defendant argues that the evidence it presents proves that Lassiter was simply less qualified than the person who received the position he sought, and therefore, CHOP's decision was legitimate and not influenced by racial animus or any other improper purpose.

Lassiter's case is similar to <u>Hicks v. Arthur</u>,[97] where an African-American plaintiff asserted a failure to promote claim alleging that her employer's employment decisions were based on "whimsical desires of the individual or the management group" in charge of hiring, and that she should

---

[93] Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 8.

[94] Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 8.

[95] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 17 (citing the Pat Pierce Report at 19).

[96] Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 7 (citing Lassiter Dep. at 183).

[97] 878 F. Supp. 737, 740 (E.D. Pa. 1995).

have received the promotion because she had substantially more practical experience than the person who was promoted.[98]  As their legitimate, non-discriminatory reason for not promoting Hicks, the defendants argued that the person promoted was more qualified than Hicks, and also that Hicks' tenure with them was in doubt when the promotion decision was made because "there were serious concerns about the way she ran her programs."[99]  This Court found the defendants' legitimate reason sufficient to shift the burden back to plaintiff to show that the proffered reason was pretextual.  Hicks presented her resume and testimony from her own deposition backing up her claims, and the Court found that evidence insufficient to "demonstrate a discriminatory animus with 'weaknesses, implausibilities, inconsistencies, incoherencies or contradictions.'"[100]  Likewise, in Oleksiak v. Barnhart, the Third Circuit affirmed the district court's decision granting summary judgment to the defendant employer where a plaintiff alleging failure to promote failed to rebut the employer's legitimate, non-discriminatory reason for its decision, which was because she was not the most qualified candidate.[101]  The Oleksiak Court held that the plaintiff's argument in rebuttal to her employer's legitimate reason was insufficient to survive summary judgment where she claimed to be the oldest candidate and she claimed that out of the twenty positions filled, only two of the people promoted were Caucasian, and she was Caucasian herself.[102]

      Resolving all inferences in favor of Lassiter, the Court assumes for the purpose of this

---

[98] Id. at 739-40.

[99] Id. at 740.

[100] Id.

[101] 231 Fed. App'x 150, 156-57 (3d Cir. 2007).

[102] Id. at 156.

analysis only that he has established a *prima facie* case of failure to promote by asserting that he is African-American and therefore a member of a protected class, he was qualified for the position to which he applied but he was rejected, and that CHOP promoted a Caucasian employee instead of Lassiter.  CHOP rests on its proffered legitimate reason that Lassiter's performance evaluations were poor, especially with respect to his ability to work with others, and that the candidate who was promoted was more qualified than him.  Lassiter's responsive briefs in opposition to summary judgment, however, continually rely on conjecture, simply reiterating the allegations made in the complaint without any specific support in the Record.[103]  Therefore, his argument that CHOP's proffered legitimate reasons are pretextual rests on his allegations that he had supervisory experience and that he was promoted to a different position after this lawsuit was filed, arguing that all of these things show CHOP acted improperly and acknowledged its own fault.  These allegations fall short of the standard required to rebut the employer's legitimate reasons sufficiently to survive summary judgment.

At the summary judgment stage, Plaintiff must criticize the employer's reason sufficiently to raise a doubt about whether it was the true reason for the action.[104]  On a motion for summary judgment, we do not determine whether the employer's decision was wise, we look at whether the employer "bore a discriminatory animus against the employee and [whether] this animus

---

[103] Defendant directs the Court to a portion of the Pat Pierce Report noting that one of Lassiter's interviewers may have been tainted by discrimination.  This comment was an aside, however, and does not change the ultimate outcome of the Pierce Report, which was that Lassiter's record supported that he was not the most qualified person for the Supervisor job and actually may need an interim supervisory position to test his leadership and team skills, which he was subsequently promoted to, at a higher pay rate.  Def.'s Reply to Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 17.  Plaintiff Lassiter did not address this portion of the Pierce Report specifically, only arguing generally that "certain of [Pat Pierce's] recitation of the facts . . . helps [sic] confirm the Plaintiff's positions."  Pl. Lassiter's Resp. to Def.'s Mot. for Summ. J. at 4.

[104] See Solt v. Alpo Petfoods, 837 F. Supp. 681, 684 (E.D. Pa. 1993).

-23-

manifested itself in some challenged action."[105]  Lassiter's allegation that he received a promotion after this lawsuit "shone a light" on the alleged discrimination at CHOP is insufficient to raise enough doubt as to CHOP's motivation in its promotion decision for this claim to survive summary judgment.[106] Similar to the other cases from this Circuit discussed above, Lassiter has not shown enough to cast doubt on the truth of CHOP's reasons.  In Oleksiak, the court explained that the plaintiff "offer[ed] no evidence except her own conclusory statements and suppositions as proof that [her employer's] decision not to promote her . . . was made because of her race and age."[107]  Likewise, Lassiter has failed to demonstrate the existence of any genuine issue of material fact as to CHOP's true motivation for its promotion decision.  Therefore, the Court holds that Defendant is entitled to summary judgment on Plaintiff Lassiter's failure to promote claim.

### (b)    Charles Wilson

Plaintiff Wilson's failure to promote claim consists of two parts.  First, Wilson alleges that he was forced out of his position as Supervisor of Central Laboratory Services and was told that he was terminated because that position was being eliminated.  Second, Wilson alleges that he was wrongly passed over for a promotion to the newly created position of Core Lab Manager, which he was in line to fill at the time he was pushed out of his position, being told that this position was also to be eliminated.  Wilson alleges that his old position was not terminated, but was in fact reposted after he

---

[105] See O'Brien v. City of Philadelphia, 837 F. Supp. 692, 698 (E.D. Pa. 1993).

[106] Plaintiffs Lassiter and Wilson both rely heavily on Defendant's monetary offer to settle their claims as evidence of CHOP's wrongdoing and its acknowledgment that Plaintiffs have viable claims.  See, e.g., Pls.' Consol. Sur-Reply to Def.'s Mot. for Summ. J. at 2-3, 8-9, 11.  The Court may not consider these arguments as information regarding settlement negotiations is inadmissible at trial pursuant to the explicit terms of Federal Rule of Civil Procedure 68, which states in pertinent part, "An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs."

[107] Oleksiak, 231 Fed. App'x at 156.

-24-

left CHOP and filled by a Caucasian employee; and the new position he sought was not terminated, but was filled by an Asian employee. For the sake of this analysis, the Court assumes that Plaintiff Wilson has established a *prima facie* case of failure to promote: he is African-American, therefore a member of a protected class; he was a candidate to fill an open position at CHOP; he was not chosen to fill the position; and after his rejection, the position remained open and was filled by a candidate of another race. Therefore, our analysis turns to CHOP's proffered legitimate, non-discriminatory reason for its action, and Plaintiff Wilson's rebuttal. Defendant argues that CHOP is entitled to summary judgment on Plaintiff Wilson's failure to promote claim because Wilson's evidence is legally insufficient to establish intentional discrimination based on racial animus in its failure to promote him to any of the positions he claims to have sought. In support of its argument, Defendant shows it had a legitimate, non-discriminatory reason for its decision not to promote Wilson to Core Lab Manager because the person appointed to that position scored higher on the candidate skills test than Wilson, previously ran a Core Lab for the University of Pennsylvania Hospital, and the Pat Pierce Report concluded that the decision to promote somebody other than Wilson to Core Lab Manager was legitimate and non-discriminatory.

In opposition to Defendant's proffered legitimate, non-discriminatory reason for not promoting or retaining him, Wilson testified at his deposition that he was told that both the position he held at the time of his termination, as well as the higher position he was in line to fill, were both being eliminated completely. Wilson testified that within two weeks of his departure from CHOP, his prior position was reposted, and he was replaced by a Caucasian employee. Additionally, Wilson testified that the new position he sought was not eliminated, but was actually filled by an Asian employee. Wilson argues that the previous facts serve as sufficient evidence that Defendant's proffered legitimate

reason is merely a pretext for the real reason motivating its decisions, which is racial animus against African-Americans.

Although Defendant offers a legitimate reason for its decision not to promote Wilson to the position of Core Lab Manager, which is well supported by Record evidence, it fails to satisfy its burden under the McDonnell Douglas analysis because it does not address Wilson's claim that he was told his position would be eliminated, which it was not, or Wilson's claim that he was replaced by a Caucasian candidate weeks after his termination.  Considering these facts in a light most favorable to Plaintiff Wilson, a reasonable fact finder could reasonably believe that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[108]  In Dean v. Kraft Foods N. America, Inc., the Eastern District of Pennsylvania denied summary judgment on a failure to promote claim where plaintiff showed that the defendant's proffered legitimate reasons for its actions were pretextual.[109]  The plaintiff in Dean presented evidence that during the two years plaintiff was the only African-American manager, she was the only employee who did not receive performance reviews and the corresponding opportunity for a salary increase.[110]  Wilson has presented evidence that CHOP treated similarly situated non-African-American employees more favorably than him.  We find this evidence, coupled with Defendant's silence in its pleadings on Wilson's claim that he was told the two positions were being eliminated, sufficient to satisfy Plaintiff's burden of showing that Defendant's proffered reason is pretextual.  The circumstances under which Wilson left CHOP,

---

[108] Fuentes, 32 F.3d at 764-65.

[109] No. 02-8609, 2005 WL 1793532, at *5-6 (E.D. Pa. July 27, 2005).

[110] Id. (explaining that the plaintiff can satisfy its McDonnell Douglas burden of presenting evidence of pretext by showing "that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.").

specifically what he was or was not led to believe by CHOP, are material facts crucial to Wilson's ability to establish a *prima facie* case of failure to promote, and the existence and truth of these facts are apparently still in dispute between the parties.  Therefore, the Court denies summary judgment on Plaintiff Wilson's claim of failure to promote.

      **(c)**     **Darlene Miley**

      Defendant argues that it is entitled to summary judgment on Plaintiff Miley's failure to promote claim because she cannot establish a *prima facie* case of failure to promote where she contemporaneously applied for two promotions and was selected for the higher paying of the two positions she applied for.  The evidence shows, and Miley concedes, that she did contemporaneously apply for two positions and received the higher paying position, as Defendant argues.  Miley's entire argument in opposition to summary judgment on this claim, therefore, is that she trained other employees who were later promoted and that her promotion came after her counsel sent a letter to Defendant advising that they intended to file this lawsuit.  Miley's assertions are not supported by the Record, and even if so, her allegations fail to establish a *prima facie* case for failure to promote, particularly prongs three and four of the analysis that require her to prove she was rejected despite her qualifications and that the position remained open and the employer continued to seek similarly qualified applicants.  The Court grants summary judgment to Defendant on Miley's failure to promote claim.

      **(d)**     **Dawn Patterson**

      Defendant argues that it is entitled to summary judgment on Plaintiff Patterson's failure to promote claim because Patterson never applied for a promotion during her tenure at CHOP, or even identified a higher position that she was interested in obtaining.  In support of its argument, Defendant

points to numerous pieces of evidence, including responses to document requests, an interrogatory response of "not applicable" to an inquiry asking her to identify each position she had ever applied for at CHOP.[111]  Most harmful to Patterson's failure to promote claim is her own deposition testimony, as follows:

| | |
|---|---|
| Counsel: | Is there any position at the Children's Hospital of Philadelphia that you ever applied for that you did not get? |
| Patterson: | No. |
| Counsel: | So, as it relates to you, there is absolutely no issue of you being turned down for a job, correct? |
| Patterson: | Correct. |
| Counsel: | As it relates to a promotion, there is absolutely no issue as it relates to you being turned down for a promotion, correct? |
| Patterson: | Correct.[112] |

Patterson fails to identify any evidence to establish a failure to promote claim on her behalf.  Additionally, in her response to the specific section of Defendant's Motion for Summary Judgment that argues "CHOP is entitled to Summary Judgment on Count V of the Amended Complaint because Plaintiff never applied for promotion to a different position at any point during her employment with CHOP,"[113] Patterson responded with simply, "Admitted."[114]  Lastly, in her Sur-reply to Defendant's Motion for Summary Judgment, "Plaintiff concedes, out of the four claims left in this

---

[111] Def.'s Reply to Pl. Patterson's Resp. to Def.'s Mot. for Summ. J. at 9 (citing Interrog. Ans. #4).

[112] Def.'s Reply to Pl. Patterson's Resp. to Def.'s Mot. for Summ. J. at 9 (citing Patterson Dep. at 81).

[113] Def.'s Mot. for Summ. J. at 3, ¶7.

[114] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5, ¶7.

action, that this claim is probably the weakest of the four."[115]  Because Patterson failed to establish a *prima facie* case of failure to promote or even address the discovered evidence Defendant presents in its Motion for Summary Judgment, the Court finds that Defendant is entitled to summary judgment on Plaintiff Patterson's failure to promote claim.

## B.   Intentional Infliction of Emotional Distress

Defendant argues that it is entitled to summary judgment on Count VII of the Amended Complaint, which alleges intentional infliction of emotional distress, because the Pennsylvania Worker's Compensation Act[116] ("PWCA") bars Plaintiffs' claims here, and in the alternative, because Plaintiffs have failed to present sufficient evidence to establish that any question of material fact exists as to Plaintiffs' IIED claim.

It is well established that the PWCA is the exclusive remedy available to employees against employers for work related injuries, under Pennsylvania law.[117]  The Third Circuit has interpreted the PWCA's exclusivity provision to have the far-reaching effect of preempting common law torts "in matters arguably connected with work-related injuries."[118]  As well, this Court has consistently held that the PWCA bars claims for intentional infliction of emotional distress that arise

---

[115] This assertion constitutes one half of the two-sentence response Plaintiffs' offer as final support for their position that Defendant is not entitled to summary judgment as to Patterson's claims.  See Pl.s' Consol. Sur-Reply at 11-12.

[116] 77 Pa. Stat. Ann. § 481(a) (2002).

[117] Id. ("The liability of an employer under this act shall be exclusive and in the place of any and all other liability to such employees . . . in any action at law or otherwise on account of any injury . . . .").

[118] Durham Life Ins. Co. v. Evans, 166 F.3d 139, 160 (3d Cir. 1999) (citing Winterberg v. Transp. Ins. Co., 72 F.3d 318, 322 (3d Cir. 1995)).

out of an employer-employee relationship.[119]  Accordingly, Plaintiffs argue that their claims fall under

the personal animus exception to the PWCA exclusivity rule, and should therefore survive summary

judgment.  The personal animus exception allows claims for "employee injuries caused by the

intentional conduct of third parties for reasons personal to the tortfeasor and not directed against him as

an employee or because of his employment."[120]  The "critical inquiry in determining the applicability of

the third-party attack [personal animus] exception is whether the attack was motivated by personal

reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work

situation so as not to arise out of the employment relationship."[121]

Plaintiffs argue, without a single cite to any authority, that the personal animus exception

is applicable to all Plaintiffs because this case is based upon racial animus, which manifested itself via

supervisors of CHOP acting as individuals, not in connection with the CHOP work environment.

However, the case Plaintiffs have presented is clearly distinguishable from the personal animus

exception.  Plaintiffs point to the same nucleus of facts to support their pendent IIED state claim as they

do for all of their other claims, including the § 1981 hostile work environment claim.  All of Plaintiffs'

alleged facts revolve around actions taken by the "duly-authorized agents of CHOP,"[122] and occurred

while at work at CHOP, in the commission of Plaintiffs' and Defendant's agents' job responsibilities.

In the context of the hostile work environment claim, Plaintiffs essentially argue that CHOP is liable for

---

[119] See, e.g., Holiday v. Comcast Cable Commc'ns, LLC, No. 05-2554, 2007 WL 551514, at *8 (E.D. Pa. Feb. 16, 2007); Imboden v. Chowns Commc'ns, 182 F. Supp. 2d 453 (E.D. Pa. 2002).

[120] Durham Life Ins. Co., 166 F.3d at 160 (citing 77 Pa. Stat. Ann. § 411(1)).

[121] Fugarino v. Univ. Servs., 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000).

[122] See, e.g., Pl. Lassiter's Resp. to Mot. for Summ. J. ("The claims of the Plaintiffs all revolve around actions taken by the *duly-authorized agents of CHOP*, which exhibited racial discrimination, with respect to *job* advancement, *workplace* harassment and several other Common Law claims, as set forth in the Complaint.") (emphasis added).

-30-

the actions of its employees because it had control over their actions and knew, or at least should have known of them.  In the context of the IIED claim, on the other hand, Plaintiffs argue that these incidents involving all CHOP employees in connection with supervisor-subordinate relations at work, promotions, holiday displays at work, and work-related public relations events, should somehow be seen as attacks motivated by personal reasons so unrelated to work at CHOP that this situation did not arise out of an employment relationship.  Plaintiffs cannot have it both ways.  It is clear that all of Plaintiffs' claims arise out of the work context, and involve the "generalized contempt or hatred"[123] that CHOP supervisors allegedly exhibited for African-American employees, as Plaintiffs have asserted to exhaustion in their pleadings.  Therefore, the personal animus exception does not apply to Plaintiffs' claims, and the PWCA appropriately bars Plaintiffs' claim for IIED.

Although the Court need not address Defendant's "extreme and outrageous" argument because the IIED claim is barred by the PWCA, Plaintiffs have also failed to present sufficient evidence from which a reasonable jury could conclude that CHOP's conduct was sufficiently extreme and outrageous to satisfy Pennsylvania IIED standards.  The Pennsylvania Supreme Court has defined IIED as occurring when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another."[124]  The court went on to note that a case for IIED is supported by establishing "only the most egregious conduct."[125]  The Third Circuit has noted that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to

---

[123] Fugarino, 123 F. Supp. 2d at 844.

[124] Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998).

[125] Id. at 754.

provide a basis for recovery for the tort of intentional infliction of emotional distress."[126]  This Court

held in <u>Coney v. Pepsi Cola Bottling Co.</u>,[127] that even in the face of "unquestionably reprehensible"

discriminatory statements and conduct, "the cases in our district have consistently held that highly

provocative racial slurs and other [racially] discriminatory incidents do not amount to actionable

outrageous conduct" in the context of IIED.[128]

     As with every other claim relevant to this summary judgment motion, Defendant

presents numerous pieces of discovered evidence in support of its argument.  For the IIED claims, this

includes Plaintiff Patterson's deposition testimony illustrating that she has not seen any doctors in

connection with the harassment and discrimination she suffered at CHOP.  When asked what harm she

suffered from these alleged wrongs, Patterson identified only stress and being upset about the

discrimination and that "having to file this lawsuit . . . is highly distressing" in itself.[129]  Therefore, it is

clear that the mere scintilla of evidence presented by Plaintiffs in support of their IIED claims, none of

which even equate to an overt racial slur in severity, do not rise to the level of outrageousness necessary

to establish a claim for IIED.  Because Plaintiffs fail to present sufficient evidence to either establish a

*prima facie* case of IIED or to rebut Defendant's arguments, the Court holds that Defendant is entitled

to summary judgment on Plaintiffs' IIED claims.

## IV. CONCLUSION

     For the foregoing reasons, the Court hereby denies summary judgment on Plaintiff

---

[126] <u>Cox v. Keystone Carbon Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988).

[127] No. 97-2419, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997).

[128] <u>Id.</u>

[129] Interrog. Ans. #5.

Charles Wilson's failure to promote claim, and grants summary judgment to defendants on all claims of all remaining Plaintiffs in this case.  An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARL LASSITER, CHARLES WILSON,     )
DARLENE E. MILEY, and     )
DAWN PATTERSON,     )
      **Plaintiffs,**     )
     )     **CIVIL ACTION**
     **v.**     )     **NO.  05-cv-6834**
     )
CHILDREN'S HOSPITAL OF     )
PHILADELPHIA,     )
      **Defendant.**     )

## ORDER

**AND NOW**, this 31st day of January, 2008, upon consideration of Defendant's respective Motions for Summary Judgment as to Plaintiffs Charles Wilson [Doc. #39], Darlene Miley [Doc. #40], Dawn Patterson [Doc. #41] and Carl Lassiter [Doc. #42], Plaintiffs' respective Responses thereto [Doc. #s 45-48], Defendant's respective replies [Doc. #s 52-55], and Plaintiffs' Consolidated Sur-Reply [Doc. #57], it is hereby **ORDERED** that:

1.    Defendant's Motion for Summary Judgment as to Charles Wilson is **DENIED** as it relates to Count V of the Complaint (failure to promote);

2.    Defendant's Motions for Summary Judgment are **GRANTED** as to all claims of all remaining Plaintiffs.

It is further **ORDERED** that upon consideration of Defendant's Motion for Sanctions Against Counsel for Plaintiff Under Federal Rule of Civil Procedure 11(b)(3) [Doc. #56], and Plaintiffs'

Counsel's Response in Opposition [Doc. #59], Defendant's motion is hereby **DENIED**.[130]

It is so **ORDERED**.

BY THE COURT:

*Cynthia M. Rufe*

**CYNTHIA M. RUFE, J.**

---

[130] The Court takes notice that the conduct of Plaintiffs' Counsel in litigating this matter has been less than exemplary, as is evidenced by our previous reprimand in this Court's October 13, 2006 Order granting and denying in part Defendant's Motion to Dismiss [Doc. #21].  However, we do not find that Counsel's assertion of these claims has violated Federal Rule of Civil Procedure 11(b)(3).  Rule 11(b)(3) states, in pertinent part:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Although the majority of Plaintiffs' claims have been dismissed due to lack of evidentiary and legal support, we find, based on the Rule 11 pleadings, that Plaintiffs' Counsel did conduct a reasonable inquiry into the facts and law sufficient to protect him from Rule 11 liability.  The Court notes, however, that Plaintiffs' Counsel has caused the Court and parties to expend a considerable amount of time and energy parsing through his carelessly arranged, insufficiently supported pleadings, and this Court expects a higher level of integrity from the members of its bar than Counsel has exhibited in this litigation thus far.  The Court warns Plaintiffs' Counsel to be more thorough and precise in his future representations to this Court and dealings with opposing counsel, as similar conduct may possibly subject him to Rule 11 liability in the future.